### PEOPLE ex rel. LEONARD v. CROPSEY, Police Com'r.

(Supreme Court, Appellate Division, Second Department. March 15, 1912.)

1. MUNICIPAL CORPORATIONS (§ 185*)—POLICE—REMOVAL—REVIEW BY CERTIORARI—EVIDENCE.

In order to sustain charges that a police officer violated the rules of the department so as to subject himself to dismissal, the evidence of each material element of the offense must be positive and not inferential.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 492–509; Dec. Dig. § 185.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes·

2. MUNICIPAL CORPORATIONS (§ 185*)—POLICE—REMOVAL—REVIEW BY CERTI-
   ORARI—SUFFICIENCY OF EVIDENCE.

   On certiorari to review a determination of a deputy police commissioner
   that relator, in violation of a department rule, left his post for reasons
   other than the performance of his duty and entered certain premises, and
   ordering his dismissal from the department, where there was no evidence
   that the relator was absent from his post while in the premises, the un-
   corroborated statements of a girl of 15 years, and of admittedly depraved
   character, are not sufficient to sustain a determination that the officer
   entered such premises for reasons other than the performance of police
   duty.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
   492–509; Dec. Dig. § 185.*]

3. MUNICIPAL CORPORATIONS (§ 185*)—POLICE—REMOVAL—REVIEW BY CERTI-
   ORARI—NEW TRIAL.

   On certiorari to review the determination of a deputy police commission-
   er that relator had violated the rules of the police department as charged,
   where it did not appear but that the erroneous findings as to a part of
   the charges may have affected the determination of another charge and
   the extreme penalty of dismissal, and where the relator's previous rec-
   ord was good, the ends of justice required a reversal of the determination
   and a new trial upon the charges.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
   492–509; Dec. Dig. § 185.*]

Certiorari on the relation of Patrick W. Leonard against James C.
Cropsey, as Police Commissioner of the City of New York, to review
the dismissal of relator from the Police Department. Determination
reversed, and new trial directed.

Argued before JENKS, P. J., and HIRSCHBERG, CARR, WOOD-
WARD, and RICH, JJ.

Jacob Rouss (Louis J. Grant, on the brief), for relator.
James D. Bell (Frank Julian Price, on the brief), for respondent.

HIRSCHBERG, J.   On the 6th day of July, 1910, three charges
in writing were filed by an inspector in the police department of the
city of New York against the relator, a patrolman.   These charges
were:   (1) That the relator at about 2:30 a. m. of January 23, 1910,
left his post for reasons other than the performance of police duty
and entered the premises No. 2084 First avenue in the borough of
Manhattan; (2) that he violated rule 45, paragraph 14, of the Rules
and Regulations of the Police Department, by failing to make report
of such action at the Thirty-Ninth Precinct Station House; and (3)
that he failed and neglected to take proper police action upon finding
one Alvina Seiler, aged 15 years, in said premises at said time.   The
relator was tried on those charges before the third deputy police com-
missioner, and on the 3d day of August, 1910, he found the relator
guilty as charged, and recommended his dismissal.   That finding and
recommendation were approved by Police Commissioner William F.
Baker on the 16th day of August, 1910, and on the same day an order
dismissing the relator from the police department was signed.

It appears that some time during the evening of January 22, 1910,
or the early morning of the following day, one Edward F. Downes, a

patrolman attached to the same precinct as the relator, brought the girl, Alvina Seiler (with whom he had previously indulged in sexual intercourse), to the building No. 2084 First avenue, a garage then used by the board of education of the city of New York and occupied by a night watchman named James Cuffe, and left her with him. Downes was tried jointly with the relator on charges relating to his conduct with this girl, and was dismissed from the department. After Downes left the garage, Cuffe unsuccessfully endeavored to induce the girl to leave. Upon her refusal to leave, Cuffe states: That he waited until the relator, who then was on patrol duty, came along. That he informed the relator that he did not wish the girl to remain in the garage. That the relator asked the girl her name and where she lived. That she refused to give the information, stating that it was none of his business. That relator then informed her that if she did not leave before he returned he would have to arrest her. That after relator left, the girl still refused to leave. That Cuffe again summoned the relator, who asked the girl if she had no home and what she meant to do. That she replied, "Yes, it is none of your business." That the relator said: "The best thing you can do is to go where you belong. I will be back right away." That the relator left and returned in 5 or 10 minutes and then found that the girl had departed meanwhile.

There is considerable conflict in the testimony as to whether the relator actually entered the building at the times he had these conversations with Cuffe and the girl. She claims that at the time of the first visit relator entered the building without having seen her and without having been summoned by Cuffe, and that at this time she hid from the relator before he saw her, pursuant to a direction from Cuffe, and that only after relator had entered the building did Cuffe inform him that she was in the building and request him to put her out. She also claims that when she first spoke to relator she informed him that Downes had brought her to the building after having indulged in sexual intercourse with her. Her testimony in these respects is uncorroborated and is denied by both the relator and Cuffe. Aside from these uncorroborated portions of her testimony, her account of the events in the garage is substantially the same as the stories told by Cuffe and the relator. Cuffe, on his direct examination, stated that relator entered the building to deal with the girl, and on his cross-examination denied that the relator entered the building at all. The relator claims that he remained in the street, standing at the threshold of an open door, talking to Cuffe and the girl, without entering the building. It is conceded that the relator made no report of these happenings.

The determination of the question whether the relator entered the garage was evidently deemed of great importance on the trial as bearing upon the truth of charges 1 and 2, that the relator had entered the building for other than police duty and had made no report of such desertion from his post. Much of the examination of the witnesses was devoted to an attempt to determine the truth of this matter, and the trial deputy adjourned the trial in order that he might obtain stenographic records of a previous examination of the relator in the district attorney's office on that subject. Those stenographic minutes,

when produced, established that the relator had told the same story regarding that matter at the district attorney's office as he told at the trial of these charges.

The fact that the relator did enter the building may perhaps be regarded as supported by sufficient evidence. We do not, however, consider that the fact of such entry, in view of the evidence in the record, sustains, or even tends to sustain, charges 1 and 2. Paragraphs 14 and 15 of rule 45 of the Rules and Regulations of the Police Department contain the provisions which, it is claimed, were violated by the relator when he entered the garage and failed to report such entry. Those paragraphs read as follows:

"Par. 14. Patrolman while on duty must not enter any house nor leave their (sic) post, except in discharge of police duty. If required by any person under any circumstances to leave post in the discharge of police duty, they will, except in great emergencies, first enter in their memorandum book the time and at whose request they left post, as follows: 'Left post at ————. o'clock at request of ————,' and will complete the entry of the facts of leaving post and the time of their return thereto as soon as they have returned to post.

"Par. 15. They will also report the same to the first lieutenant or sergeant of their precinct whom they may meet thereafter, giving the time and circumstances of such call, and the time of return to post; they will also make report at the station house."

It appears from an inspection of these rules that the patrolman is not forbidden to enter a house or leave his post "in discharge of police duty." Manifestly, if the relator entered the garage to investigate Cuffe's story regarding the girl, such entry was in discharge of police duty and not a violation of the rules. The only testimony that he did not enter for that purpose is the uncorroborated statement of the girl. Despite her tender years, her debased character is such that her uncorroborated statements cannot be deemed sufficient to sustain such an accusation as is the subject of this investigation. Moller v. Moller, 115 N. Y. 466, 22 N. E. 169; People v. Donohue, 114 App. Div. 830, 833, 100 N. Y. Supp. 202; Osborne v. Seligman, 39 Misc. Rep. 811, 81 N. Y. Supp. 346. Moreover, it appears from these rules that the patrolman is required to make a report only when he has left his post. There is no evidence in the record to show that relator's entry of the garage constituted a leaving of his post. On the contrary, the only testimony adduced on that subject established the fact that this garage was covered at the time in question by relator's post. Inspector Titus, the complainant, testified as follows:

"Q. Were both these officers" (Downes and the relator) "attached to the Thirty-Ninth precinct on January 22d and 23d, last? A. They were, sir. Q. What tour did Downes have? A. Downes had the first tour; the post he covered was known as night post 4, and ½ of 3. Q. Did it cover this garage? A. Yes, sir. * * * Q. What tour did Leonard have? A. Leonard had from 2 a. m. until 8 a. m. of January 23d, the same post."

[1, 2] It is well settled that, in order to sustain grave charges like those herein presented, there must be positive and not inferential evidence of each material element of the offense. People ex rel. Roe v. MacLean, 57 Hun, 141, 10 N. Y. Supp. 803; People ex rel. Deloughry v. Welles, 5 App. Div. 523, 39 N. Y. Supp. 50; People ex rel. Kenny v. Bingham, 127 App. Div. 49, 111 N. Y. Supp. 92. As the record

stands, there is no evidence whatever to show that the relator was absent from his post while in the garage, and the uncorroborated statement of the girl that he entered the garage without having been summoned by Cuffe, if entitled to any weight, is in view of her habits and character merely a scintilla, quite insufficient to sustain the determination of the police commissioner. People ex rel. Coyle v. Martin, 142 N. Y. 352, 356, 37 N. E. 117.

Most of the testimony relates to the first and second charges. That relating to the third charge, that relator did not take proper police action upon finding the girl in the garage, is neither extensive nor conflicting. On that testimony the learned counsel for the respondent contend that the relator should have been convicted of failing to take proper police action; that the relator should have conducted a more thorough investigation regarding the girl's character and antecedents when he found her alone in the garage with Cuffe, and should not have left her there at that early morning hour after having merely admonished her to go home under threat of arrest if he found her there upon his return. On the other hand, it is contended by the learned counsel for the relator that he had a right to use his own judgment; that he could not take the girl into custody without a complaint and a complainant against her; and that no overt act was committed by her in his presence warranting her arrest. Assuming but without deciding that the third charge has been proven, it is obvious that the trial deputy and the commissioner may have been influenced in convicting the relator thereof and in sentencing him to the extreme penalty of dismissal by an erroneous belief that he had also been proven guilty of concealing the events at the garage, in violation of the rules of the department.

[3] The relator's previous record in the police department appears to be good, and we are of opinion, in view of all the facts, that the ends of justice will be best subserved in this case by reversing the determination of the police commissioner because of the erroneous decision of the first and second charges, and because of the possible effect of that error upon the determination of the third charge and upon the punishment inflicted, and by directing a new trial of these charges before the present commissioner or one of his deputies. See People ex rel. Reardon v. Partridge, 86 App. Div. 310, 83 N. Y. Supp. 705.

The determination should be reversed, without costs, and a new trial directed in accordance with the views herein expressed. All concur.